[No. A095914. First Dist., Div. Five. Feb. 28, 2002.]

STEPHEN J. SMITH, as Director, etc., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and J. R. W.
CONTEMPORARY, INC., Respondents.

COUNSEL

John M. Rea, Vanessa L. Holton and Claire Ervin Lee for Petitioner.

No appearance for Respondent Workers' Compensation Appeals Board.

Law Offices of Martin S. Weinstein, Martin S. Weinstein; Santana & McClellan and Regina McClellan for Respondent J. R. W. Contemporary, Inc.

OPINION

STEVENS, J.—In this opinion, we consider the formula for determining when parents should be considered "partial dependents" of their adult children living at home, for purposes of recovering death benefits. We conclude that the deceased must provide a net financial benefit to the household, deducting first those costs attributable solely to the deceased.

When a worker dies with no dependents, the employer is required by Labor Code section 4706.5, subdivision (a)[1] to pay an equivalent death benefit to the Department of Industrial Relations (DIR) for addition to the Subsequent Injuries Fund (SIF) (see subd. (c)). The amount paid to DIR is equal to the death benefit paid when the deceased leaves one person totally dependent and no partial dependents, currently set at $125,000 by section 4702, subdivision (a)(3).

In this case, an unmarried worker living with his parents died from industrial causes. His parents elected not to pursue a claim that they were dependent upon him. However, the employer filed a dependency claim on their behalf. The Workers' Compensation Appeals Board (Board) agreed with the employer that, by paying Lori and Lawrence Walker $150 per month as rent, Joshua Walker made them his dependents. The Board awarded the Walkers a partial dependency award of $7,200, four times the annual rent. It then ordered that DIR take nothing, permitting the employer/insurance carrier to save $117,800.

We conclude that the Board analyzed dependency incorrectly and for that reason discounted compelling evidence that the $150 per month rent did not fully reimburse the Walkers for Joshua's food. We annul the Board's decision.

*Facts and Procedural History*

Joshua was 22 when he died from industrial causes. At the time, he was working for J. R. W. Contemporary, Inc. (JRW), a furniture manufacturer. He had always lived at home and when he turned 21, he began paying $150 per month as rent. He made his own car payments and reimbursed his parents for car insurance because his car was covered by their policy. He was also covered by their health insurance and they paid his copayments for him. Copayments were at most $50 per year. After Joshua was injured and went into the hospital, the household food bill went down by $50 to $75 per week.

Before the Walkers purchased their house, they rented it. They took Joshua's rent into consideration when they decided to purchase the house in 1998 and they counted on his payments to help them make the mortgage payments. However, their standard of living did not change financially when they stopped receiving his payments.

Although the Walkers originally submitted a death benefit claim, they asked the Board to dismiss it. JRW objected to dismissal of the Walkers'

---

[1] All statutory references are to the Labor Code.

application and filed its own claim on the Walkers' behalf. The Board allowed the claim to proceed and JRW to make dependency arguments for the Walkers.

After hearing, the workers' compensation judge (WCJ) found that the Walkers were partially dependent upon Joshua because his $150 rent helped them purchase their home. Pursuant to section 4702, subdivision (a)(4), she awarded them $7,200, calculated at four times his annual rent. The Board denied the DIR's petition for reconsideration, and this petition followed. We granted writ of review. Based upon our review of the record, we annul the Board's decision.

*The DIR's Arguments*

Citing several Supreme Court cases, some recent and some from the 1920's, the DIR contends that the Board applied the wrong standard for dependency when it found the Walkers were partial dependents even though Joshua made no net financial contribution to their household. DIR asserts the WCJ and Board erroneously took into account the rent paid without deducting the amount devoted to Joshua's own support.

*Discussion*

When an injured worker dies, any accrued or unpaid compensation is paid to his or her dependents. If there are no dependents, these funds are distributed with the worker's estate. (§ 4700.) The employer is also liable for reasonable burial expenses, not to exceed $5,000, and for "[a] death benefit, to be allowed to the dependents when the employee leaves any person dependent upon him or her for support." (§ 4701.) Section 4702 sets the death benefit amount. If the worker left one total dependent and no partial dependents, the death benefit is $125,000 (§ 4702, subd. (a)(3)). If the worker left only partial dependents, the amount of the benefit is "four times the amount annually devoted to the support of the partial dependents" but in no case more than $125,000 (§ 4702, subd. (a)(4)). Section 4703 governs allocation of the death benefit when there are two or more dependents. It provides that in the case of only partial dependents, "the amount allowed as a death benefit shall be divided among the persons so partially dependent in proportion to the relative extent of their dependency."

If an employee dies without any surviving dependent, section 4706.5, subdivision (a) dictates that "the employer shall pay a sum to the Department of Industrial Relations equal to the total dependency death benefit that would be payable to a surviving spouse with no dependent minor children." That

amount is set at $125,000 by section 4702, subdivision (a)(3). The amount is to be deposited in the General Fund and credited as a payment into the SIF.[2]

None of these code sections defines dependency, but the wording of section 4702, subdivision (a)(4) suggests its meaning; it defines the partial dependency benefit as four times the amount "devoted to the support of the partial dependents."

Division One of this court has proffered the following definition, taken from the dictionary and from treatises: "Generally speaking, a dependent is one who relies on another for support. [Citation.] Webster defines dependent as 'One who is sustained by another, or who relies on another for support or favor.' [Citations.] 1 Campbell on Workmen's Compensation (1935 ed.) section 863, pages 767-768 states: 'Dependency is a present, existing relation between two persons where the one is sustained by, or relies on, the aid of the other for his means of living. This does not mean absolute dependency for the necessities of life, but rather that the dependent looks to and relies upon the contributions of the injured employee in whole or in part as a means of supporting and maintaining such dependent in accordance with his accustomed mode of life. Dependency within the meaning of the Act involves the idea of a present, current reliance upon the decedent for support.' [Citations.]" (*Industrial Indem. Co. v. Industrial Acc. Com.* (1966) 243 Cal.App.2d 700, 705-706 [52 Cal.Rptr. 647].)

Much of the case law on dependency in the workers' compensation setting arises under sections 3501 and 3502. Section 3501 provides that a child under 18 or one over that age who is physically or mentally unable to earn "shall be conclusively presumed to be wholly dependent" upon a parent with whom he or she was living. Section 3502 provides that in all other cases "questions of entire or partial dependency . . . shall be determined in accordance with the facts as they exist at the time of the injury of the employee."

Many of the concepts in the current death benefit statutes were a part of the original workers' compensation act, adopted in 1917. Originally, the partial disability award was calculated at "three times the annual amount devoted by the deceased to the support of the [dependents]." (Stats. 1917, ch. 586, §§ 9(c)(2), 14, pp. 840, 844-845.) The concepts and much of the

---

[2]The SIF is taxpayer supported. When a repeatedly injured employee's disability award is reduced by section 4750, which protects subsequent employers from the impact of progressiveness in the disability rating table (*Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 6 [128 Cal.Rptr. 673, 547 P.2d 449]), the employee is entitled to seek benefits from the SIF to bring him or her up to the level of one who is disabled by a single injury.

wording of this part of the act were continued in its 1937 rewrite. (Stats. 1937, ch. 90, § 4702, p. 284.) The formula then changed from three times to three and one-half times annual support in 1939 (Stats. 1939, ch. 308, § 1, p. 1581) and to four times annual support in 1947. (Stats. 1947, ch. 1031, § 1, p. 2302.)

The Supreme Court addressed the 1917 version in *Spreckels S. Co. v. Industrial Acc. Com.* (1921) 186 Cal. 256 [199 P. 8]. That decision demonstrates partial dependency in its simplest form, receiving money and providing nothing in return. The deceased in that case at first provided $145 per month, the sole support for his paralyzed brother and the brother's family. By the time of the accident, the decedent's brother's wife had secured a teaching position, and the decedent reduced his support to $45 per month. The Supreme Court simply held that the per annum amount used to compute the benefit paid to the brother and his family should be based upon the $45 per month rate at the time of death, not the total amount provided by the decedent during the previous year. "The whole theory of the compensation act as to death cases is that the dependents of the employee killed through some hazard of his employment shall be compensated for the loss of the support they were receiving from him at the time of his injury." (*Id.* at p. 258.)

Later the same year, the Supreme Court decided *Insurance Co. v. Industrial Acc. Com.* (1921) 186 Cal. 517 [199 P. 8] (*Insurance Co.*), a decision involving facts similar to those presented here. The 18-year-old decedent in *Insurance Co.* was living with his mother, sister and 20-year-old brother at the time of his death. During the previous year, he contributed $1,218.30 to the support of his partially dependent mother, a sum that included the expenses of his own board and lodging and $30 of his own clothing. In making its award to the mother, the commission made no deduction for the decedent's own expenses for clothing, board and lodging. (*Id.* at p. 518.)

The *Insurance Co.* court concluded the commission erred. "Money which goes to the support of the deceased himself is, of course, not devoted to the support of any other person. . . . It follows that in determining the annual amount devoted to the support of the dependent mother, the amount of the general family expense paid by the decedent should be diminished by deducting the fair proportion thereof that went to the support of the decedent himself and to others in the family who were not dependent upon him." (*Insurance Co., supra,* 186 Cal. at p. 519.) The court distinguished a contrary Massachusetts decision because compensation under its statute was gauged by the " 'the amount contributed by the employee to such partial dependents,' " not the amount devoted to the support of the partial dependents, as stated in the California statute. (*Id.* at pp. 519-520.)

In *Standard Varnish Wks v. Indus. Acc. Com.* (1925) 197 Cal. 143, 146-147 [239 P. 1067], applying the foregoing principle, the court upheld a commission award that was computed by deducting from the payments made to the decedent's mother the proportion used for the decedent's own support.

Two recent Supreme Court decisions cited to the Board have brought forward in time the principles stated by the court in its 1921 opinions. *Atlantic Richfield Co. v. Workers' Comp. Appeals Bd.* (1982) 31 Cal.3d 715, 720, 722 [182 Cal.Rptr. 778, 644 P.2d 1257], cited favorably the *Spreckels* decision and stated that "[f]ood, clothing, or incidental expenses incurred for the decedent's own personal use, however, cannot reasonably be considered as part of 'the amount annually devoted to the support of the partial dependent.' " *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1194-1195 [81 Cal.Rptr.2d 521, 969 P.2d 613], cited *Insurance Co.,* discussed *Spreckels* in some detail and rejected a claim that, in computing the amount devoted to the dependent's support, the Board should exclude income from sources that continued after death.

*Larsen v. Industrial Acc. Com.* (1950) 34 Cal.2d 772 [215 P.2d 16], an earlier Supreme Court decision examining dependency of a child, not a parent, lends further support to the notion that the value of food and housing should be considered when deciding the "dependency" issue. In *Larsen,* the decedent left a totally dependent widow, a partially dependent mother-in-law and a 19-year-old daughter whose dependency status was in issue. The commission found that the daughter was not dependent because she had income of $37 per week. The *Larson* court noted, however, that the daughter contributed nothing to household expenses and received her room and board free because she was trying to save money. It noted also that the commission had found the value of the mother-in-law's free room and board to be $72 per month. The court concluded that because the decedent was contributing the same necessities to both, the daughter, like the mother-in-law, was partially dependent upon the decedent. (*Id.* at pp. 773-774.)

We find it clear from *Larsen* that receiving free room and board may help a family member qualify as a dependent. The questions we confront here are the reverse: (1) whether providing room and board to a working adult in exchange for "rent" payments may qualify a "landlord" family member as a dependent, and (2) whether, in order for the landlord to qualify as a dependent, the amount of rent must exceed the cost of the food and other necessities provided.

(1) *May receiving "rent" qualify a parent as a dependent?*

■ The WCJ concluded, because Joshua's payment of $150 per month rent "along with the rent paid by his sisters enabled his parents to purchase the home," it qualified as support payments. The payments "contributed to the family's standard of living." The principle applied by the WCJ is sound. Payments made by an adult child to assist the family in paying its bills, buying its home, or otherwise maintaining its lifestyle qualify as support payments and may be considered in assessing whether the parent is a dependent.[3] While the principle is sound, the Board's decision may be sustained only if the principle was applied correctly. The Walkers may be considered dependents only if, in fact, Joshua's payments contributed to maintaining the family's standard of living.

(2) *Must the "rent" exceed cost of food and other necessities provided?*

The WCJ did not directly address this question in her opinion. She gave the Walkers full credit for the $150 per month payments in calculating the "amount devoted to" their support. In justifying this award, she merely stated: "[DIR] argues that dependency cannot be found because allegedly decedent cost more to feed than he paid in rent. I do not believe that is the test that must be applied. Joshua lived in the family home all his life and was eating at the same rate before he started to pay rent as after."

In her report and recommendation on petition for reconsideration, the WCJ considered the evidence about Joshua's eating, noting his mother's estimate that her food bill went down $50 per week after Joshua was hospitalized (inaccurately converting the testimony from "$50 to $75" into $50). She noted that, on further questioning, Ms. Walker acknowledged that she was with Joshua every day and was not eating at home when he was hospitalized. The WCJ opined that the food bill was reduced by Ms. Walker's changed pattern and by a daughter's moving out. Again the WCJ rejected DIR's claim that the parents could not be considered Joshua's dependents because he made no net monetary contribution to them. She noted again the direct relationship between Joshua's paying rent and the family's buying its home.

---

[3]Arguably, if the "rent" payments were for a separate unit that would normally be rented for as much or more to a stranger, this principle would not apply. However, there is no evidence in this case that Joshua lived anywhere except in the main living quarters in the family's house.

We observe that the *Insurance Co.* court implicitly called on the Board to deduct from the decedent's payments the amount that would be attributable to his lodging expense. One could debate whether this should be done routinely for an adult child living at home in a room the parents would not likely rent to another person, but it is an issue we need not address in light of our conclusion that Joshua's "rent" did not even cover his food.

The error in the WCJ's analysis was her uncritical acceptance of Joshua's free food as the "status quo" despite his attaining adulthood and obtaining employment. It is true that, in typical fashion, Joshua received free food from his parents when he was a minor. Presumptively and perhaps actually, he was totally dependent upon them. By the time he turned 18, that situation had changed somewhat because he was working and they required him to pay them $150 per month, which they described as "rent."

Neither the fact that they called it "rent" and apparently related it to their mortgage payment nor the circumstance that they might not have purchased the house without his agreement to pay rent turned them into his dependents. If, as the evidence shows, Joshua was not fully reimbursing his parents for the food and medical copayments they provided, his $150 payment merely made *him less dependent upon them.* It did not make them dependent upon him.

The WCJ mentioned the *Atlantic Richfield* decision in her report and recommendation on petition for reconsideration but ignored the crucial passage from its page 722, quoted above. She relied instead upon the decision in *Arp v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395 [138 Cal.Rptr. 293, 563 P.2d 849] (*Arp*). *Arp* is an important decision because, instead of extending it to widowers, the court invalidated on equal protection grounds the conclusive presumption that a widow who had been living with her husband was totally dependent upon him. The WCJ purported to find a "test" in *Arp* and concluded that the test was met in this case.

Scouring *Arp* for a test, we find only one candidate: "widows and widowers alike, will be required to prove their dependency, and will be compensated in accordance with the facts and circumstances shown. (§ 3502.) An unemployed spouse presumably can easily establish total financial dependency on the deceased employee, and even an employed spouse may well be able to show partial dependency, since partial dependency is determined in light of the applicant's standard of living. [Citations.]" (*Arp, supra,* 19 Cal.3d at p. 410.) This explanation can hardly be considered a "test" and certainly is not a test that supersedes that described by *Insurance Co., Atlantic Richfield* and other Supreme Court decisions or a test that justifies the Board's decision. The WCJ and the Board therefore erred in concluding that no deductions should be made for Joshua's personal expenses.

The WCJ's analysis of the evidence about food cost deserves further examination—to see if the evidence could possibly support the Board's determination that the Walkers were dependent upon Joshua. Lori Walker first testified that when Joshua went into the hospital, the family food bill

went down "[b]etween $50 and $75 a week." On examination by JRW, she testified that before his injury, it had been about $200 a week, and it then went down to "$125 to $150 a week, so $200 a month that's conservative."

Ms. Walker also admitted that her youngest daughter moved out about two weeks before the injury, but she testified her daughter is not a very big eater. The daughter only ate dinner with the family about three times a week and would have only a cup of coffee at breakfast time. She did not notice the bill going down in the weeks between the daughter moving out and Joshua's injury.

Ms. Walker also testified that she herself ate less for a while after her son's injury. On occasion she would eat at the hospital, but most of the time she ate at home or brought food from home. On further examination, after testifying about her own eating habits and her daughter's departure from the home, Ms. Walker agreed with her earlier testimony that the reduction attributable to her son not eating at home anymore was $50 to $75 per week.

Mr. Walker testified that he agreed with his wife on the changes in their food bill.

No witness quantified the food bill reduction in a way that would support a finding that Joshua's $150 monthly payment covered all the food he ate. JRW fails to even argue here that Joshua made a net contribution to his parents. Instead, JRW repeats the WCJ's position that the Walkers relied upon Joshua's payment in purchasing their house. JRW says only the following about food costs: "If, in the case at hand, the Walkers were able to maintain the same living standards even after the death of the deceased, it would clearly be based upon the fact that the weekly food bill decreased by $50.00 to $75.00 following the decedent's injury."

JRW's and the WCJ's analyses are equally flawed. They fail to follow the approach outlined by the California Supreme Court in 1921 and repeated in 1982. They do not deduct from the decedent's payments the portion attributable to his or her own food, clothing, etc. The fact that the Walkers could maintain their living standard after Joshua's death demonstrates that they were not financially dependent upon him.

That the Walkers took into account Joshua's $150 in deciding to purchase the house does not show that they were dependent upon him for their standard of living. It shows only that *his dependency upon them* was a strain upon their finances before they started charging him rent. They could not afford to purchase a house while they were providing him $200 to $300

worth of free food each month. When he started reimbursing them $150 per month, they could. After his death, they still could afford their house-because their food bill decreased more than $150.

The Board's award to the Walkers is vacated, and the Board is directed on remand to make an appropriate award to the DIR instead.

Jones, P. J., and Simons, J., concurred.